CANDLELIGHT PROPERTIES, LLC, and Ronald E. Farren, Appellants–Plaintiffs/Counterclaim Defendants,

v.

MHC OPERATING LIMITED PARTNERSHIP, An Illinois Limited Partnership, and MHC Lending Limited Partnership, An Illinois Limited Partnership, Appellees–Defendants/Counterclaimants.

No. 03A01–0006–CV–177.

Court of Appeals of Indiana.

May 29, 2001.

Rehearing Denied July 16, 2001.

Todd A. Richardson, Bette J. Dodd, Lewis & Kappes, P.C., Indianapolis, IN, Attorneys for Appellants.

Thomas G. Stayton, Andrea Roberts, Baker & Daniels, Indianapolis, IN, Attorneys for Appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE [1]

Appellants–Plaintiffs–Counterclaim Defendants, Candlelight Properties, L.L.C. (Candlelight) and Ronald E. Farren (Farren) (hereinafter referred to collectively as "Appellants"), bring this consolidated appeal following two trial court judgments in favor of Appellees–Defendants–Counterclaimants, MHC Operating Limited Partnership (MHC Operating) and MHC Lending Limited Partnership (MHC Lending). The first judgment resulted from a Complaint for Declaratory Judgment filed by Candlelight against MHC Operating and Chicago Title Insurance Company (Chicago Title)[2] for a determination of the parties' rights and obligations under an Option to Purchase Agreement between Candlelight and MHC Operating. In this action, a bench trial was held on the merits and the trial court entered its original judgment determining that MHC Operating had validly exercised the option to purchase real estate. In the second action, the trial court entered summary judgment in favor of MHC Lending in a foreclosure action it filed against Candlelight and Farren, as guarantor, finding that Candlelight defaulted on an $8.05 million loan from MHC Lending.

We reverse and remand for further proceedings.

### ISSUES

On appeal, the Appellants raise the following two restated issues:

1. Whether in the trial court's declaratory judgment it properly determined that MHC Operating validly exercised its option to purchase the real estate, when the notice MHC Operating gave to Candlelight deviated from the form required by the Option Agreement.

2. Whether the trial court properly granted summary judgment in favor of MHC Lending on MHC Lending's foreclosure action, by finding that Candlelight defaulted on an $8.05 million loan from MHC Lending for failing to pay the loan by its due date.

### FACTS AND PROCEDURAL HISTORY

Plaintiff and counterclaim defendant Candlelight is an Indiana domestic limited liability company with its principal office in Indiana. Defendant and counterclaimant MHC Operating is an Illinois limited partnership with its principal office in Illinois, and is in the business of acquiring, owning and operating manufactured home communities throughout the United States. Defendant and counterclaimant MHC Lending is an Illinois limited partnership with its principal office in Illinois, and is in the business of offering property loans secured by real estate. Defendant Chicago Title is a Missouri corporation with offices in Indiana and its principal office in Illinois.

Candlelight is the owner of a manufactured home community consisting of approximately 110.96 acres of real estate and related improvements in Columbus, Indiana, commonly known as "Candlelight Village." Farren owns a ninety-nine percent (99%) interest in Candlelight and sought to cash out the appreciation he had acquired in Candlelight Village on a tax-deferred basis.

On May 3, 1996, Candlelight and MHC Lending agreed that MHC Lending would loan Candlelight $8.05 million. The terms of the loan were provided in a Promissory

---

1. We heard oral argument on March 28, 2001, in Indianapolis, Indiana.

2. Chicago Title is not a party to this appeal.

Note dated May 3, 1996. Pursuant to the Promissory Note, Appellants agreed to pay MHC Lending, on or before May 3, 1999, a debt in the principal sum of $8,050,000 or such lesser amounts as may be outstanding from time to time, together with interest thereon as set forth in the Promissory Note. The Promissory Note was secured with a Mortgage, Assignment of Rents and Security Agreement, an Assignment of Leases and Rents, and a Security Agreement, all dated May 3, 1996. The Mortgage assigned to MHC Lending all rents and revenues from Candlelight Village. The Lease Assignment assigned to MHC Lending all of Candlelight's rights under the lease agreements covering all or any portion of Candlelight Village, including all rents and revenues payable under the lease agreements. The Mortgage and the Lease Assignment also required all rents and revenues of the Real Estate to be deposited in a Lock Box Account, as such term is defined in a Lock Box Agreement dated May 3, 1996, which was to be used for payment of obligations under the Note and the Mortgage.

Although Candlelight was required to repay the Promissory Note in full by May 3, 1999, the Promissory Note allowed Candlelight to extend the term of the loan. Specifically, the Promissory Note provided that:

> [Candlelight] may extend the term of the Loan, and thus the Due Date, for a period of six (6) months (the "Extension Period") from the end of the third (3rd) Loan Year by giving notice to [MHC Lending] of its intention to extend the term of the Loan if MHC Operating has not exercised its option to purchase the Property, in order to facilitate Borrower's refinancing of the Loan. [Candlelight] shall give [MHC Lending] notice of its intention to so extend the Loan no later than the earlier to occur of (a) thirty (30) days after MHC Operating

notifies [Candlelight] that it will not exercise its option and (b) thirty (30) days prior to the Due Date if [Candlelight] has received no notice from MHC operating regarding exercise of the option. (R. 700).

Moreover, as part of the May 3, 1996 transaction, Candlelight and MHC Operating entered into an Option to Purchase Agreement as additional security to MHC Lending for the loan to Candlelight. Pursuant to the Option Agreement, Candlelight granted to MHC Operating an irrevocable option to purchase Candlelight Village, and MHC Operating paid Candlelight $150,000 as consideration for the grant of the option.

In conjunction with the Option Agreement, Candlelight executed a Warranty Deed conveying Candlelight Village to MHC Operating and deposited the Deed in escrow with Chicago Title.

On May 9, 1996, Candlelight and MHC Operating entered into a letter agreement that amended the Option Agreement to give Candlelight the option of receiving cash or partnership units in MHC Operating if MHC Operating exercised the Option to purchase Candlelight Village.

On May 5, 1997, Candlelight and MHC Operating entered into another letter agreement that further amended the Option Agreement to address the effect on the purchase price for Candlelight Village of a rent increase implemented by Candlelight. In conjunction with the execution and delivery of the Option Agreement and the making of the Loan, Farren executed and delivered a Guaranty dated May 3, 1996, in favor of MHC Lending and MHC Operating. Under the terms of the Guaranty, Farren guaranteed payment of $700,000 to MHC Operating upon its exercise of the Option, which was to be applied against the purchase price provided for in

the Option Agreement. The Option Agreement prescribed how MHC Operating was to exercise the Option:

3. *Exercise of the Option.* The Option must be exercised either (i) if the Loan is not accelerated or prepaid, at any time during the 180 day period prior to the third (3rd) anniversary of the date of the Agreement or (ii) if the Loan is accelerated, within ninety (90) days after the date [MHC Operating] receives notice of the acceleration of the Loan from [Candlelight] or Lender, or (iii) if the Loan is extended for any reason other than that [MHC Operating] has not given the Option notice, at any time after [Candlelight]'s receipt from [MHC Operating] of the Option Notice (as hereinafter defined). Notice of the exercise shall be given in the form attached to this Agreement as *Exhibit B* (the "Option Notice"). [Candlelight] shall notify [MHC Operating], if the Loan is accelerated, that the Loan has been accelerated or extended as the case may be and the date of such acceleration or date of such extension.

(R. 1421).

Because the Loan was neither accelerated nor prepaid, MHC Operating was permitted to exercise its Option at any time between November 4, 1998 and May 3, 1999 (the 180 day period prior to the third anniversary of the date of the Agreement).

On March 11, 1999, MHC Operating sent to Candlelight two letters, one being a cover letter referencing the enclosed Option Notice, and the other being MHC Operating's exercise of the Option. The cover letter provides in pertinent part as follows:

I am enclosing [MHC Operating's] notice to [Candlelight] of [MHC Operating's] election to exercise its option to purchase [Candlelight Village] in accordance with the above-referenced Agreement. As provided for in the Agreement, please have [Candlelight] execute the enclosed Agreement for Contribution of Real Estate and Related Property ("Contribution Agreement") (which conforms to the form of Contribution Agreement attached as *Exhibit C* to the Agreement, with various blanks filled in, exhibits attached and supplemental provisions inserted as contemplated by the Agreement).

(R. 1822). The Option Notice states that:

The undersigned hereby exercises its option to purchase [Candlelight Village] in accordance with the terms of the Agreement. As required by the Agreement, within five (5) days after delivery of this notice, the Contract (as defined in the Agreement) must be executed by [Candlelight] and returned to [MHC Operating] for execution. Regardless, the Contract is hereby deemed to be executed by each of us as of the date of delivery of this notice.

(R. 1824). However, the form notice attached to the Option Agreement as Exhibit B provides as follows:

The undersigned hereby exercises its option to purchase [Candlelight Village] in accordance with the terms of the Agreement. As required by the Agreement, within five (5) days after delivery of this notice, the Contract (as defined in the Agreement *and annexed thereto as Exhibit C* ) must be executed by [Candlelight] and returned to [MHC Operating] for execution. Regardless, the Contract is hereby deemed to be executed by each of us as of the date of delivery of this notice.

(R. 1781) (emphasis supplied). Therefore, in its Option Notice, MHC Operating omitted the words "and annexed thereto as Exhibit C."

Under the terms of the Option Agreement, the Contribution Agreement was "deemed to have been executed" by Candlelight and MHC Operating as of the date of the delivery of the Option Notice. (R. 1824). Upon receipt of the letters, Farren determined that significant changes had been made to the Contribution Agreement and that the formula for the purchase price in MHC Operating's tendered version of the Contribution Agreement was significantly different from the formula originally bargained for and attached to the Option Agreement. The Contribution Agreement sent on March 11, 1999, contained a new exhibit describing a different formula for determining the purchase price. Essentially, Candlelight claims that MHC Operating included a definition of "CAC sites" (those financed by Capital Acceptance Corporation) in its proposed Contribution Agreement, which had the effect of lowering the purchase price by $784,648. Candlelight further argues that the new definition of "CAC sites" had the effect of increasing the number of "CAC sites," thereby decreasing the purchase price, and affecting the tax advantages of the transaction.

Thereafter, Candlelight rejected and refused to sign either the Option Notice or the Contribution Agreement.

On May 5, 1999, Candlelight filed a Complaint for Declaratory Judgment against MHC Operating and Chicago Title for a determination of the parties' rights and obligations under the Option to Purchase Agreement. On June 7, 1999, MHC Operating filed its Answer and Counterclaim and also a third party complaint against Farren as a personal Guarantor. The matter was tried on October 12, 1999, on stipulated facts, exhibits and oral arguments, without live testimony.

On December 1, 1999, the trial court entered its original judgment, determining that MHC Operating had validly exercised its option to purchase. The judgment provides in relevant part as follows:

The Court finds as follows:

A. That MHC timely attempted to exercise its option by a proper form.

B. That a critical term, "CAC sites" was never adequately defined in terms of when a site was to be such even though both parties were represented by counsel.

C. Neither party was in a position of greater sophistication than the other.

D. That either the agreements required both parties to negotiate in good faith the term of "CAC sites" as to the timing of those sites for determining the appropriate discount or the option was not capable of being exercised unless MHC capitulated to the definition preferred by Candlelight.

IT IS THEREFORE ORDERED THAT:

1. MHC [Operating] has validly exercised the Option.

2. Candlelight is under an obligation to negotiate with MHC to come to a specific meaning for the term "CAC sites".

3. Absent an agreement between the parties regarding the specific meaning for the term "CAC sites", the entire Agreement regarding the purchase is voidable by MHC and the $700,000 previously paid to Candlelight is to be returned to MHC.

4. The escrow agreement is still pending a resolution of the dispute, but Chicago Title may remove itself from further proceedings in this case by turning the deed over to the Court.

5. The issue of damages and attorneys fees may be presented in additional proceedings upon the filing of a motion by either party.

(R. 476–477).

On December 30, 1999, Candlelight and Farren filed their Motion to Correct Errors and on January 3, 2000, MHC Operating filed a Cross Motion to Correct Errors. The trial court heard the motions to correct errors on March 28, 2000. Pursuant to Ind.Trial Rule 53.3, the motions to correct errors were deemed denied on April 27, 2000. However, on May 15, 2000, the trial court rendered the following amended judgment:

1. MHC Operating's Motion to Correct Errors is granted, and Candlelight's and Farren's Motion to Correct Errors is denied.

2. MHC Operating has validly exercised the Option.

3. MHC Operating is entitled to specific performance of the Option Agreement. Within thirty (30) days of the entry of this amended judgment, Candlelight shall sell and transfer [Candlelight Village] to MHC Operating pursuant to the terms of the following:

 (a) Option to Purchase Agreement dated May 3, 1996;

 (b) Agreement For Contribution of Real Estate and Related property attached to the Option Agreement as Exhibit C;

 (c) Letter agreement dated May 9, 1996; and

 (d) Letter agreement dated May 5, 1997.

4. To the extent that the parties cannot agree on how the term "CAC sites" is to be applied, the Guaranty provides a definition to which the parties have agreed.

5. Judgment is entered for MHC Operating and against Farren on the Guaranty dated May 3, 1996, in the amount of $700,000, plus prejudgment interest of $40,656.30, for a total judgment of $740,656.30.

6. Chicago Title shall deliver the Deed to MHC Operating. If Chicago Title already has deposited the Deed with the Court pursuant to the Court's prior order, the Court's Clerk shall deliver the Deed to MHC Operating.

7. The issues of damages and attorneys fees may be presented in additional proceedings upon the filing of a motion by either party.

8. Judgment is entered in favor of MHC Operating and against Candlelight on Candlelight's Complaint, and the Complaint is dismissed. Judgment is entered in favor of MHC Operating and against Candlelight and Farren on MHC Operating's Counterclaim.

9. Court costs shall be paid by Candlelight and Farren.

(R. 656–657).

Meanwhile, on May 6, 1999, MHC Lending filed a foreclosure action against Candlelight and Farren to collect the loan and foreclose the mortgage on Candlelight Village. Candlelight and Farren filed their Answers and Affirmative Defenses on July 1, 1999. MHC Lending moved for summary judgment on July 28, 1999, arguing that there was no genuine issue of material fact regarding Candlelight's default on the loan. On January 12, 2000, MHC Lending filed a Motion for Appointment of a Receiver. The trial court held a hearing on this motion on February 25, 2000, and granted MHC Lending's motion. The Receiver took possession of the Property on March 17, 2000. On April 14, 2000, the trial court held a hearing on MHC Lend-

ing's Motion for Summary Judgment. On May 15, 2000, the trial court entered summary judgment in favor of MHC Lending. The summary judgment provides in pertinent part as follows:

1. MHC Lending's motion for summary judgment is granted.

2. MHC Lending is granted judgment on its Complaint against Defendants, jointly and severally, in the sum of:

 (a) $8,877,034.20 in unpaid principal and accrued but unpaid interest through April 14, 2000;

 (b) $3,354.17 per day in additional accrued interest from April 14, 2000, through the date of this judgment, or a total of $103,979.27 making a total judgment of $8,981,013.47, plus costs, all without relief from valuation and appraisement laws.

3. The Mortgage is foreclosed and the liens and equity of redemption of Defendants and all persons claiming under and through them are foreclosed on the following described real estate . . . commonly known as Candlelight Village.

(R. 1279–1280). The trial court reasoned that:

7. The due date of the Note was May 3, 1999 ("Due Date"). Candlelight had the right to extend the Due Date if MHC Operating did not exercise its option to purchase the Real Estate. The Court has determined in the related case [declaratory action], . . . that MHC Operating validly exercised its option to purchase. Candlelight therefore had no right to extend the Due Date of the Note.

8. Regardless of whether MHC Operating exercised its option to purchase, the Note required Candlelight to give notice of its intent to extend the Due Date by April 3, 1999. Candlelight did not timely extend the Due Date in accordance with the Note. The undisputed fact is that Candlelight did not attempt to extend the Note until May 5, 1999. Defendants also did not pay the Note by the Due Date.

9. Because Candlelight failed to extend the Due Date of the Note by April 3, 1999, and Defendants further failed to pay the Note by May 3, 1999, Defendants are in default, and MHC Lending is entitled to summary judgment on the Complaint.

10. MHC Lending also is entitled recover all rents and revenues of the Real Estate that have accrued since the date of Defendants' default and have not been delivered to MHC Lending previously, including all funds in the Lock Box Account.

11. The material facts and law concerning Defendants' default are not in dispute and the Loan Documents are not ambiguous.

12. MHC Lending is not estopped from enforcing the Loan Documents as a matter of law. Defendants have not presented evidence of the essential elements of equitable estoppel.

(R. 1278–1279).

On May 19, 2000, Appellants filed a Praecipe for the Record in the Foreclosure Action and the Declaratory Judgment Action. On August 24, 2000, this Court granted the Appellants' motion to consolidate the appeals.

## DISCUSSION

### I. *Validly Exercised Option*

Candlelight contends that MHC Operating has not validly exercised the Option

because the Option Notice materially differs from the form the notice was required to take pursuant to the Option Agreement. Candlelight further argues that because the terms of the Contribution Agreement tendered by MHC Operating differed from the form of the Contribution Agreement attached to the Option Agreement as Exhibit C, the Option Notice was a counteroffer that Candlelight rejected. Essentially, Candlelight claims that MHC Operating's tender of the proposed Contribution Agreement was a breach of the Option Agreement, and MHC Operating's breach voided Candlelight's contractual duty to sell Candlelight Village pursuant to the Option Agreement.

On the other hand, MHC Operating contends that it validly exercised the Option and is entitled to specific performance of Candlelight's agreement to sell Candlelight Village to MHC Operating. Moreover, MHC Operating denies that its tender of the proposed Contribution Agreement was a counteroffer and further denies that its tender changed the contractual duties of Candlelight and Farren under the Option Agreement.

Therefore, before we reach the issue of whether the trial court properly granted summary judgment in favor of MHC Lending on MHC Lending's foreclosure action, by finding that Candlelight defaulted on an $8.05 million loan from MHC Lending for failing to pay the loan by its due date, we must first determine the threshold issue of whether MHC Operating validly exercised its Option. Because the trial court's foreclosure judgment, finding that Candlelight defaulted on the loan, depends upon the finding that MHC Operating did validly exercise the Option to Purchase and Candlelight subsequently refused to honor MHC Operating's Option Notice since it felt that MHC Operating did not validly exercise the Option, we will begin by analyzing the validity of MHC Operating's Option Notice.

We find it necessary at the outset to decipher Candlelight's argument between the substance or content of MHC Operating's notice it gave under the Option Agreement, and the effect of the notice it gave. Specifically, Candlelight first claims that the Option Agreement had attached to it certain prenegotiated forms and the specified manner and form that MHC Operating's notice of its intent to exercise the Option was to take. Candlelight's first argument focuses upon MHC Operating's failure to give proper notice of its intent to exercise the Option by omitting the six words, "and annexed thereto as Exhibit C" (R. 1781), which referenced the agreed upon Contribution Agreement, thereby deviating from the proper content the notice was required to take by failing to comply with the specified notice requirements attached to the Option Agreement. Therefore, Candlelight's first argument with respect to the validity of MHC Operating's notice of its intention to exercise the Option focuses upon a linguistic deviation. However, Candlelight's second argument rests upon the effect of the alleged improper notice. Specifically, Candlelight claims that by failing to properly reference the Contribution Agreement in its Option to purchase the real estate, MHC Operating essentially failed to properly reference the negotiated terms and conditions of the purchase contained within the Contribution Agreement. Although MHC Operating did in fact send Candlelight a Contribution Agreement with its option notice, the formula for the purchase price contained within MHC Operating's revised Contribution Agreement differed from the formula originally bargained for and attached to the Option Agreement. Thus, Candlelight contends that by failing to reference the bargained for Contribution Agreement in its Option notice, and in-

stead sending a revised Contribution Agreement, the parties' bargained for agreement had been altered because the terms they had negotiated, mainly the purchase price, had been compromised by MHC Operating's deviation from the contractually specified manner and form that the Option notice was to take.

 Both parties agree that this consolidated appeal predominantly revolves around the correct interpretation and application of various contractual provisions. Therefore, initially, we review the relevant rules of contract interpretation. When reviewing the trial court's interpretation of a contract, we view the contract in the same manner as the trial court. *Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307, 1311 (Ind.Ct.App.1991), *reh'g denied, trans. denied.* Words used in a contract are to be given their usual and common meaning unless, from the contract and the subject matter thereof, it is clear that some other meaning was intended. *Moore Heating & Plumbing, Inc. v. Huber, Hunt & Nichols,* 583 N.E.2d 142, 146 (Ind.Ct.App.1991). Words, phrases, sentences, paragraphs, and sections of a contract cannot be read alone. *Id.* The entire contract must be read together and given meaning, if possible. *Id.* Indiana courts routinely enforce contracts as a matter of law. As this court has noted:

> [O]ur supreme court has consistently expressed its commitment to advancing the public policy in favor of enforcing contracts. Indiana courts recognize that it is in the best interest of the public not to unnecessarily restrict persons' freedom to contract. Thus, as a general rule, the law allows persons of full age and competent understanding the utmost liberty in contracting; and their contracts, when entered into freely and voluntarily, will be enforced by the courts.

*Robinson v. Century Personnel, Inc.,* 678 N.E.2d 1268, 1269–70 (Ind.Ct.App.1997) (citations omitted). The construction of a written contract is a question of law. *Tippecanoe Valley School Corp. v. Landis,* 698 N.E.2d 1218, 1221 (Ind.Ct.App.1998). *Accord Bastin v. First Indiana Bank,* 694 N.E.2d 740, 746 (Ind.Ct.App.1998). Moreover, when a party indicates its intention to exercise an option to purchase real estate "clearly and unequivocally, ... [r]ecitation of the exact terms of the agreement [is] not necessary." *Rowland v. Amoco Oil Co.,* 432 N.E.2d 414, 417 (Ind.Ct.App. 1982). Indiana courts order specific performance of contracts for the purchase of real estate as a matter of course. *New Life Comm. & Church of God v. Adomatis,* 672 N.E.2d 433, 438 (Ind.Ct.App.1996). Courts readily order specific performance because each piece of real estate is considered unique, without an identical counterpart anywhere else in the world. *Unger v. Indiana & Mich. Elec. Co.,* 420 N.E.2d 1250, 1261 (Ind.Ct.App.1981). Only essential terms need be included to render a real estate option contract enforceable. *See Wolvos v. Meyer,* 668 N.E.2d 671, 676 (Ind.1996) (holding option to purchase property was enforceable and affirming order of specific performance or real estate option agreement).

 Here, Candlelight argues that MHC Operating did not validly exercise the Option because the Option Notice deviated from the required form. Specifically, Candlelight contends that under Indiana law, in order for the exercise of an option to purchase real estate to be valid, it must be in strict compliance with the essential terms and conditions of the underlying agreement. Thus, Candlelight claims that because MHC Operating did not strictly comply with the essential terms required to be followed by the Option Notice form, the Option was not validly exercised.

First, Candlelight argues that MHC Operating deviated from the prescribed form of notice as required by the Option Agreement. Specifically, Candlelight contends that the Option Agreement was very specific in detailing how the Option was required to be exercised by providing that "notice of the exercise *shall* be given in the form attached to this Agreement as *Exhibit B*." (R. 1775) (emphasis supplied). However, when MHC Operating sent notice intending to exercise the Option to Purchase, the notice it gave was not identical to the notice form attached as Exhibit B to the Option Agreement. The required notice attached to the Option Agreement stated that, "As required by the Agreement, within five (5) days after delivery of this notice, the contract (as defined in the Agreement *and annexed thereto as Exhibit C*) must be executed by Owner and returned to Purchaser for execution." (R. 1781) (emphasis supplied). In the notice MHC Operating sent to Candlelight, the phrase "and annexed thereto as Exhibit C" was omitted. Thus, Candlelight claims that MHC Operating omitted from its notice the required reference to the form Contribution Agreement as attached to the Option Agreement and in the same package tendered a revised Contribution Agreement that materially differed from the previously negotiated form.

On the other hand, MHC Operating argues that it met the one requirement for exercising the Option when it sent Candlelight an Option Notice that was "identical to the form notice attached to the Option Agreement as Exhibit B, with one small exception." (Appellee's Brief at 29). Specifically, MHC Operating concedes that it inadvertently omitted the phrase "and annexed thereto as Exhibit C" from its notice to Candlelight, but MHC Operating relies on the trial court's finding that this alleged defect was an error or omission and not of design, and did not affect the validity of the Option Notice. Thus, MHC Operating claims that the omission of these six words did not alter its intent to give notice of its election to exercise the Option to Purchase Candlelight Village. Specifically, MHC Operating relies on this Court's decisions in *Rowland*, 432 N.E.2d at 414, and *Theobald v. Chumley*, 408 N.E.2d 603 (Ind.Ct. App.1980), for the proposition that under Indiana law, when a party indicates its intention to exercise an option to purchase real estate "clearly and unequivocally ... [r]ecitation of the exact terms of the agreement [is] not necessary." *Rowland*, 432 N.E.2d at 417. In *Rowland*, this Court rejected the rule that the exercise of an option is only effective if it strictly adheres to the terms stipulated in the agreement, and upheld specific performance of an option contract even though the party purporting to exercise the option mistakenly included the incorrect purchase price in the notice. *Id.* at 416. In *Theobald*, we held that when Theobald communicated his intent to exercise the option, the contract was consummated and binding upon both parties, and that the additional acreage included in the warranty deed prepared by Theobald amounted to only an offer that could be either accepted or rejected by the optionors. *Theobald*, 408 N.E.2d at 606. Thus, MHC Operating contends that the defects in the option notices in *Rowland* and *Theobald* were far more substantial than the alleged defect in MHC Operating's option notice, and here, the trial court correctly concluded that the omitted words were immaterial.

However, Candlelight distinguishes *Rowland*, arguing that here, MHC Operating's deviation from the previously negotiated terms of the Option Agreement were not an inadvertent error, and instead, went beyond the omission of an inconsequential phrase. Specifically, Candlelight contends that MHC Operating deleted the required

reference to the form of the Contribution Agreement as attached to the Option Agreement and instead enclosed a revised Contribution Agreement, and misstated that its revised Contribution Agreement conformed to the form of Contribution Agreement attached as Exhibit C to the Agreement.

Nevertheless, MHC Operating argues that in order to exercise the Option, the Option Agreement did not require MHC Operating to provide Candlelight with a Contribution Agreement, rather, the Option Agreement expressly stated that the Contribution Agreement attached to the Option Agreement as Exhibit C was deemed to have been executed by Candlelight and MHC Operating and dated as of the date of the delivery of the Option Notice. (R. 1824). MHC Operating claims that it performed every requirement of the Option Notice, and therefore, Candlelight was bound to execute the Agreement. Moreover, MHC Operating asserts that Candlelight is confusing changes to the Contribution Agreement with the omission of words from the Option Notice. Specifically, MHC Operating argues that it was not required pursuant to the Option Notice to provide a Contribution Agreement, and that Candlelight has offered no evidence contrary to the trial court's conclusion that the omission of words from the Option Notice did not amount to anything more than inadvertent immaterial omission. Thus, MHC Operating claims that it validly exercised the Option and the omission of the words from the Option Notice amounted to nothing more than an error of omission and not design. Although we agree with MHC Operating and uphold the trial court's finding that MHC Operating's omission was not of design and did not affect the validity of the notice, we cannot agree that MHC Operating's notice was valid. Specifically, we hold that MHC Operating's inadvertent omission of the words from its notice in and of itself was immaterial and did not affect its notice of its intention to exercise the option to purchase Candlelight Village.

Nevertheless, we further find that the effect of the notice MHC Operating gave of its intention to exercise the Option was not the bargained for effect of the Option Agreement, and therefore we hold that MHC Operating did not validly exercise its Option to purchase Candlelight Village. We begin our analysis of the effect of MHC Operating's notice of its intention to exercise the Option by noting Candlelight's reliance on *Lafayette Expo Center, Inc. v. Owens*, 531 N.E.2d 508 (Ind.Ct.App.1988), *reh'g denied, trans. denied*, for the proposition that strict adherence to the terms of the agreement is required for the effective exercise of an option. In that case, the option to purchase was contained in a lease with the right to purchase the property for $345,000 payable as follows:

> Ten Thousand Dollars ($10,000.00) down. Balance on Land Contract at ten percent (10%) interest with monthly payments of Two Thousand Seven Hundred Dollars ($2,700.00) per month or more until paid in full, at any time land contract may be paid off without penalty.

*Id.* at 509. Plaintiff then attempted to exercise the option to purchase, construing the option as a right to purchase the property for the sum of $345,000.00 payable at $10,000.00 down and the balance on a real estate contract at 10% interest with monthly payments in the amount of $2,700.00. *Id.* Plaintiff's interpretation of the option to purchase insisted that the payments should amount to $2,700.00 per month, but Defendant refused to accept the option to purchase because payments of $2,700.00 per month would never satisfy payment of the principal and would not fully pay accumulating interest. *Id.* Plain-

tiff brought a specific performance action to enforce the option to purchase, and Defendant moved for summary judgment, which the trial court granted. *Id.* Specifically, the trial court found that the Plaintiff did not timely exercise the option to purchase. *Id.* at 510. Thus, in *Lafayette*, we analyzed the case as a timeliness issue and held that "to exercise an option to purchase, the decision to purchase must be made by the optionee under the terms of the option and the decision must be communicated *within the life of the option.*" *Id.* (emphasis supplied).

On the other hand, MHC Operating distinguishes *Lafayette*, arguing that in the case at bar, the timing of MHC Operating's exercise of the Option is not at issue, and therefore, Candlelight's reliance on *Lafayette* is misplaced. Moreover, MHC Operating claims that in *Lafayette* the option notice contained purchase terms contrary to the option agreement. MHC Operating further argues that the Appellants' complaint is that MHC Operating proposed purchase terms not in the Option Notice, but in a separate document, specifically, the Contribution Agreement tendered by MHC Operating by separate letter on March 11, 1999. Thus, MHC Operating contends that its exercise of the Option was not dependent on it tendering a conforming Contribution Agreement at all, but instead, under the terms of the Option Agreement, the exercise of the Option was dependent solely upon giving valid notice, which it did. MHC Operating further distinguishes *Lafayette* by noting that in that case, the prospective purchaser indicated that it would purchase the property only on payment terms that differed from the parties' agreement, thus reflecting a repudiation of the agreement. *Id.* at 509. Here, MHC Operating argues, there is no evidence that it intended to repudiate the parties' original agreement if Candlelight did not agree to MHC Operating's proposed Contribution Agreement. We agree with MHC Operating and uphold the trial court's finding that Candlelight's reliance on *Lafayette* is unavailing. Specifically, the trial court found that:

> The timing of MHC Operating's exercise of the Option is not at issue. Moreover, in *Lafayette Expo*, the option notice itself contained purchase terms contrary to the option agreement. Candlelight and Farren complained here that MHC Operating proposed purchase terms—not in the Option Notice—but in a separate document, the Contribution Agreement tendered by MHC Operating by separate letter on March 11, 1999. Trial Exh. 1, Depo Exh. 9. MHC Operating's exercise of the Option was not dependent on it tendering a conforming Contribution Agreement or, for that matter, any Contribution Agreement at all. Under the terms of the Option Agreement, the exercise of the Option was dependent solely on giving a valid notice, which MHC Operating did.

(R. 655). Therefore, while we agree that MHC Operating's exercise of the Option was dependent solely on giving a valid notice, and that MHC Operating did properly notify Candlelight of its intention to exercise the Option, we hold that the validity of exercising the Option is also dependent on the effect of its notice, rather than dependent merely on the linguistic requirements contained within the Option Agreement.

■ In *Brokaw v. Roe*, 669 N.E.2d 1039 (Ind.Ct.App.1996), *trans. denied*, we noted the requirement of strict adherence to an option's terms. Specifically, we stated:

> An option to purchase real estate is a contract by which the owner of the realty agrees with another person that the latter shall have the power to purchase

such property at a fixed price within a certain period of time. By an option, the owner subjects himself to the liability of having to convey the property if the option is exercised within the time and in the manner stipulated. By failing to comply with the option's terms, the option holder deprives himself of the right to demand the enforcement of the contract. Because the optionee is the only party capable of exercising the option, courts have required strict adherence to the option's terms. The court in *Lafayette Expo* observed: It has been many times held that an option to purchase gives no right of property in and to the thing which is the subject of the option. It is not a sale. It is not even an agreement for a sale. At most, it is but a right of election in the party receiving the same to exercise a privilege, and only when that privilege has been exercised by an acceptance does it become a contract to sell.

*Id.* at 1041 (citations omitted). However, our supreme court noted in *Wolvos*, 668 N.E.2d at 676, "that only essential terms need be included in order to render a contract enforceable, and that all that is required is reasonable certainty in the terms and conditions of the promises made, including by whom and to whom."

█ In the case before us, the trial court found that MHC Operating did send valid written notice to Candlelight of its intent to exercise the Option. However, under the Option Agreement, the parties bargained for MHC Operating's notice to comply with a specific manner and form contained in the Contribution Agreement. Therefore, although MHC Operating's *notice* of its intent to exercise the option was proper, its exercise of the Option was invalid because it deviated from the specified manner and form of exercising the Option by failing to reference the bargained for

Contribution Agreement in its notice, and instead altering the essential terms and conditions contained within the Contribution Agreement. Thus, in effect, MHC Operating's exercise of the Option to purchase Candlelight Village deviated from the bargained for method of achieving the purchase price of the property and effectively disadvantaged Candlelight by lowering the agreed upon purchase price. Moreover, MHC Operating's effort to exercise the Option failed to strictly and unequivocally adhere to the essential terms and conditions of the purchase provision. Essentially, the agreed upon price for MHC Operating to exercise the Option to purchase Candlelight Village was determined by employing the method contained as Exhibit E, "Calculation of Purchase Price" (R. 1812), to the Option Agreement. However, the term "CAC sites" was not specifically defined in Exhibit E, but instead, was defined in Farren's Guaranty to MHC operating dated May 3, 1996 as follows:

Following MHC OP's purchase of the Property and for a period of sixty (60) months thereafter, monthly rent at then current rental rates with respect to sites ("CAC Sites") *having residents who as of the date of MHC OP's purchase of the Property have financed their homes with Capital Acceptance Corporation or its successor ("CAC").*

(R. 1740–1741) (emphasis supplied). Nevertheless, in its Proposed Contribution Agreement, MHC Operating included as Exhibit F, a materially different "Formula for Calculation of Acquisition Value." (R. 1665). Specifically, MHC Operating defined "CAC sites" as follows:

As used herein, (a) the term *CAC Sites* means Sites occupied as of the Closing Date by residents whose manufactured homes were *originally financed with Capital Acceptance Cor-*

*poration or its successor (\*CAC\*), notwithstanding that CAC may subsequently have transferred such financing to another party, and (b) the term \*non-CAC Sites\* means all Sites other than CAC Sites.*

(R. 1665). Therefore, MHC Operating's definition of the term "CAC Sites" provided that these sites were ones that were originally financed by Capital Acceptance Corporation, while Farren's definition of the term provided that "CAC Sites" were ones that had been financed by Capital Acceptance Corporation as of the date of purchase.

Therefore, because in its notice to exercise the Option, MHC Operating did not properly comply with the provisions of the Option Agreement, the Option Agreement is void *ab initio*, and MHC Operating has no authority to purchase the real estate, while Candlelight has no obligation to fulfill the conditions of the Option.

## II. *Extension of Due Date on Note*

 Next, Candlelight argues that the trial court's foreclosure judgment, finding that Candlelight defaulted on the loan, was erroneous because Candlelight properly extended the due date of the Promissory Note. Specifically, Candlelight contends that because MHC Operating did not validly exercise the Option to Purchase Candlelight Village, Candlelight had the option to extend the due date of the Promissory Note.

 Generally, construction of a written contract is a question of law for the trial court for which summary judgment is particularly appropriate. *Mid State Bank v. 84 Lumber Co.*, 629 N.E.2d 909, 914 (Ind.Ct.App.1994). Whenever summary judgment is granted based upon the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or that the contract

ambiguity, if one exists, can be resolved without the aid of a factual determination. *Id.*

In the present case, the trial court found that the "material facts and law concerning [Candlelight's] default are not in dispute and the Loan Documents are not ambiguous." (R. 1279). Specifically, the trial court reasoned that:

7. The due date of the Note was May 3, 1999 ("Due Date"). Candlelight had the right to extend the Due Date if MHC Operating did not exercise its option to purchase the Real Estate. The Court has determined in the related case [declaratory action], ... that MHC Operating validly exercised its option to purchase. Candlelight therefore had no right to extend the Due Date of the Note.

8. Regardless of whether MHC Operating exercised its option to purchase, the Note required Candlelight to give notice of its intent to extend the Due Date by April 3, 1999. Candlelight did not timely extend the Due Date in accordance with the Note. The undisputed fact is that Candlelight did not attempt to extend the Note until May 5, 1999. Defendants also did not pay the Note by the Due Date.

9. Because Candlelight failed to extend the Due Date of the Note by April 3, 1999, and Defendants further failed to pay the Note by May 3, 1999, Defendants are in default, and MHC Lending is entitled to summary judgment on the Complaint.

(R. 1278–1279).

Both parties agree that the Promissory Note unambiguously set forth the following requirements for extending the due date:

[Candlelight] may extend the term of the Loan, and thus the Due Date, for a period of six (6) months (the "Extension Period") from the end of the third (3rd) Loan Year by giving notice to [MHC Lending] of its intention to extend the term of the Loan if MHC operating has not exercised its option to purchase the Property, in order to facilitate Borrower's refinancing of the Loan. [Candlelight] shall give [MHC Lending] notice of its intention to so extend the Loan no later than the earlier to occur of (a) thirty (30) days after MHC operating notifies [Candlelight] that it will not exercise its option and (b) thirty (30) days prior to the Due Date if [Candlelight] has received no notice from MHC operating regarding exercise of the option.

(R. 700).

MHC Lending argues that under the terms of the Promissory Note, Candlelight had no right to extend the due date if MHC Operating exercised the Option to Purchase Candlelight Village, and because the trial court concluded that MHC Operating did validly exercise the Option, the trial court concluded that Candlelight had no right to extend the due date of the Promissory Note. Thus, MHC Lending asserts that Candlelight defaulted on the loan as a matter of law.

Moreover, MHC Lending contends that even if we conclude that MHC Operating did not validly exercise the Option, the undisputed fact remains that Candlelight failed to extend the due date by the deadline set in the Promissory Note. Specifically, the Promissory Note required Candlelight to give notice of its intent to extend the due date by the earlier of two dates. Both parties agree that clause (a) does not apply because MHC Operating did not give notice that it was not exercising the Option to Purchase. Therefore, only clause (b) applies, and that deadline was

April 3, 1999, which was thirty days prior to the due date if Candlelight had received no notice from MHC Operating regarding exercise of its Option. However, the facts are undisputed that Candlelight failed to give notice of its intention to extend the due date until May 5, 1999, two days after the Note had matured.

Therefore, MHC Lending contends that even if Candlelight's objection to the form of the Option Notice succeeds, Candlelight still failed to give timely notice of its intention to extend the due date of the Note. The undisputed fact remains that MHC Operating sent its Option Notice on March 11, 1999, approximately one month before the April 3, 1999 deadline, and approximately two months before Candlelight sent its intent to extend the due date on May 5, 1999. Thus, MHC Lending claims that if MHC Operating's Option Notice was invalid due to its form, Candlelight essentially had not received notice of MHC Operating's exercise of the Option, and had time to comply with clause (b) to extend the due date.

The sum of MHC Lending's argument is that the Promissory Note set a deadline for extending the due date of the loan and Candlelight failed to give notice by that deadline. Therefore, by failing to validly extend the loan and by failing to pay the Note by the due date, Candlelight breached the Note and Guaranty as a matter of law, and the trial court properly concluded that MHC Lending was entitled to summary judgment.

On the other hand, Candlelight's sole argument with respect to the extension of the due date of the Note is that it was entitled to an extension because MHC Operating did not validly exercise the Option to Purchase. Specifically, Candlelight argues that because neither of the contingencies in the extension provision were ful-

filled, its duty to provide thirty days notice of its intention to extend the due date was never triggered. Therefore, Candlelight claims that because MHC Operating's Option Notice was invalid, and MHC Operating did not notify Candlelight that its intention was to not exercise the Option to Purchase, Candlelight had no obligation to notify MHC Lending of its intention to extend the due date thirty days before the due date or thirty days after MHC Operating gave notice that it intended to not exercise its Option. · Essentially, Candlelight argues that:

> The original due date of the note was the same day the option expired. Candlelight could extend the due date only if MHC Operating did not exercise the option. By serving a defective notice and trying to force a revised Contribution Agreement, MHC operating placed Candlelight in a position in which its right to an extension did not ripen until the option expired. Given that the event triggering the right to extend was contemporaneous with the due date, a reasonable period after that date must be allowed to give meaning and effect to the extension provision.

(Appellant's Brief at 37).

■ In our plain reading of the terms of the Promissory Note, with respect to Candlelight's option to extend the term of the loan, we find that Candlelight had the right to extend the term of the Note in order to facilitate refinancing of the loan, by notifying MHC Lending of its intention to extend the term of the loan *only if* MHC Operating had not exercised its option to purchase Candlelight Village. Nevertheless, MHC Operating did give notice of its intention to exercise the Option to purchase Candlelight Village, however, the parties were engaged in a controversy

about whether MHC Operating validly exercised the Option, rather than whether MHC Operating properly notified Candlelight of its intention to exercise the Option. Therefore, Candlelight's option to extend the term of the loan depends upon whether MHC Operating exercised its Option to purchase Candlelight Village. Because neither party could have foreseen our ruling that MHC Operating did not validly exercise its Option, we refrain from construing the due date extension option as a superfluous provision. Instead, we make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Abbey Villas Dev. Corp. v. Site Contractors, Inc.,* 716 N.E.2d 91, 100 (Ind.Ct. App.1999) *reh'g denied, trans. denied.* Therefore, we hold that because at the time MHC Operating notified Candlelight of its intention to exercise its Option to purchase Candlelight Village, neither party was aware that the exercise of the Option was invalid, we now hold that to foreclose the loan as a result of this unforeseen occurrence is unreasonable. Thus, we reverse the trial court's decision to foreclose the Mortgage for Candlelight's failure to timely extend the due date of the loan.

## CONCLUSION

Based on the foregoing, we hold that in the trial court's declaratory judgment it improperly determined that MHC Operating validly exercised its option to purchase the real estate. Moreover, the trial court improperly granted summary judgment in favor of MHC Lending on MHC Lending's foreclosure action, by finding that Candlelight defaulted on an $8.05 million loan from MHC Lending for failing to pay the loan by its due date. Therefore, we reverse the trial court's declaratory judg-

ment and hold that MHC Operating invalidly exercised its Option to purchase Candlelight Village, and reverse and remand the trial court's foreclosure judgment for further proceedings to reach an equitable decision consistent with this opinion.

Reversed and remanded for further proceedings.

DARDEN and ROBB, JJ., concur.